## SULLIVAN v. SULLIVAN

[No. 220, September Term, 1959, and No. 25 (Adv.) September Term, 1960]

*Decided June 30, 1960.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*W. Byron Sorrell,* for appellant.

*Arthur J. Hilland,* for appellee.

HENDERSON, J., delivered the opinion of the Court.

These appeals are from two orders of the chancellor in the same case. The first dismissed a husband's bill for divorce on the ground of desertion and awarded the wife alimony of $250 a month. The second order awarded to the wife a counsel fee of $2,500 "as a contribution toward her solicitor's fees." It is conceded that the wife left the marital home on March 19, 1956, and never returned. The chancellor found that her departure was justified by the husband's misconduct, and although she did not file a cross-bill for divorce, he granted her alimony as prayed in the answer, upon a finding that she would have been entitled to a divorce, if prayed.

The parties were married in 1952, and there were no children of the marriage. He was a wealthy business man who had been previously divorced. See *Sullivan v. Sullivan,* 199 Md. 594. She had been employed in the office of Senator Carlson of Kansas before the marriage and continued the employment thereafter. The record presents the picture of a man addicted to alcohol, of a quarrelsome, overbearing and jealous disposition. Her testimony, which was fully corroborated, indicates that he repeatedly assaulted and beat her, on slight provocation, so that on numerous occasions she was compelled to flee from the home, or leave hotel rooms where they stayed. When intoxicated, as he frequently was, he also repeatedly called her vile and derogatory names, charging her with infidelity in the presence of guests and in public places. The situation became so intolerable that on July 7, 1955, she fled from the home. On this occasion he used extreme physical violence against her, necessitating medical attention, and immersed her entire wardrobe in tubs of water. But on August 3, 1955, she returned upon his promise to reform.

For a few months thereafter he was sober and contrite, having joined Alcoholics Anonymous and consulted a psychiatrist, but relapsed into his former habits. In November, 1955, she was forced to leave their hotel room in Greenbay because of his intoxicated condition and threats of violence. On December 20, 1955, he humiliated her by making a scene in a restau-

rant where they were dining with friends, in the course of which he called her a "two-bit whore", whom he had "picked up off the street", and charged her with specific acts of infidelity. The same thing happened on February 8, 1956. She testified that these charges were wholly unfounded. She testified that he also adopted a course of persecution, spying upon her, calling her office to ask "who she was out with", and blackguarding her to her friends and associates. On March 18, 1956, she testified he followed her home from church. He denied this, and testified that they had marital relations that night. She did not specifically deny that they had marital relations that night. She testified at one point that she had never refused to have intercourse with him, but she testified that she had become so nervous and fearful of him that she determined to leave the next day. She did not inform him of her decision, recalling his conduct when she had previously left the home. The next morning she moved out, taking her belongings with her. His course of persecution did not stop. He wrote her numerous insulting letters, interspersed with protestations of affection and offers of gifts, and made almost daily calls to her office in which he addressed insulting remarks concerning her character and behavior to the telephone operators and her associates. Thereafter, he requested that she enter into a separation agreement, but upon her refusal, he filed suit for divorce.

The chancellor properly stated the general rule that misconduct, although conditionally condoned, may be revived by subsequent misconduct. He found that the wife made reasonable efforts over a long period of time to save the marriage, and that his conduct was such that for her to continue to live with him would be definitely injurious to her health, safety and self-respect. We cannot say that his findings were clearly wrong. The books are replete with cases in which unfounded charges of infidelity, especially when coupled with spying, public abuse and physical violence, have been held to entitle a wife to divorce, either on the ground of cruelty or of constructive desertion. In *Silverberg v. Silverberg,* 148 Md. 682, 691, Judge Parke, for the Court, said: "No form of cruelty is so intolerable as to make a wanton and public

charge of infidelity against a wife under circumstances which expose her to shame and contumely." See also *Poole v. Poole,* 176 Md. 696 (unreported), 6 A. 2d 243, 245; *Robertson v. Robertson,* 187 Md. 560, 565; *Rosenthal v. Rosenthal,* 202 Md. 375, 380, and *Pohzehl v. Pohzehl,* 205 Md. 395, 407.

The appellant contends, however, that all of his acts of misconduct were condoned by her action in continuing sexual relations up to the time of her departure. In *Duckett v. Duckett,* 143 Md. 551, 556, Chief Judge Boyd, for the Court, said that "the rule is that sexual cohabitation after acts of cruelty cannot be considered as condonation in the sense in which it would be after an act of adultery. * * * It must depend in some measure upon the circumstances and particularly the temperament of the wife. A woman may be so situated that she cannot, without risk of great bodily harm by a brutal husband, prevent sexual intercourse with him, and continue to occupy his bed; * * *." In that case sexual cohabitation was said to be "evidence of condonation." In *Glass v. Glass,* 175 Md. 693 (unreported), 2 A. 2d 443, the husband committed a violent assault upon the wife, and she swore out a warrant for his arrest. He claimed that, while the assault case was pending, they engaged in marital relations on two subsequent occasions, and that this was condonation. Judge Sloan, for the Court, after citing *Duckett v. Duckett, supra,* and *Bowie v. Bowie,* 3 Md. Ch. 51, 55, said: "The authorities generally agree that condonation after acts of cruelty depends upon circumstances and the situation of the parties, and whether there has been forgiveness and reconciliation." This statement is borne out by a recent Note in 32 A. L. R. 2d 107, 135, where it is said: "* * * in view of the rules that a forgiveness is an essential element of condonation and that a condonation is therefore a state of mind, the better view concerning the significance of a resumption of cohabitation seems to be that such an act is merely evidence and is not of itself a condonation." To the same effect, see Nelson, *Divorce* (2d ed.), § 11.03; Keezer, *Marriage and Divorce* (3d ed.), § 519; Note 44 Ky. Law Journ., p. 241.

The appellant strongly relies upon *Smith v. Smith,* 198 Md. 630. In that case the husband owned a boat in which he

took out fishing parties for hire, and his departure from the home, which the wife claimed was a desertion, was not out of the ordinary. His statement that he went to work on his boat was not denied. He came home and found his wife drunk, for which he upbraided her, but they nevertheless had sexual relations. This Court found no evidence of desertion, and that in fact neither party considered that there had been any desertion. But Judge Markell, for the Court, made the further statement (p. 634) that "[t]o constitute condonation, other conduct may require evidence of intent, but we think the sound view is that the law itself ascribes to marital relations the conclusive effect of condonation and specifically of terminating desertion. * * * Such relations are legally compatible only with marriage, not with separation. The concept of 'constructive desertion', when the deserter and the deserted continue to live under the same roof, cannot make out of marriage a hybrid status of separation with occasional concubinage."

We think the decision in that case was correct on the facts. Her claim that he intended to permanently terminate marital relations when he went to work on his boat was uncorroborated and in fact disproved by his resumption of relations. As the Court pointed out, if he had made up his mind to separate, it was improbable that he would complain of finding her intoxicated, and he was under no compulsion whatever to engage in sexual intercourse. We cannot agree that the language quoted was intended to lay down a rule that sexual intercourse constitutes condonation in all circumstances, as a matter of law, or that it was intended to overrule prior decisions of this Court, which were not even cited. It may be true that a claim of "constructive desertion", in the sense of an unwarranted refusal to have marital relations, is conclusively rebutted by proof that marital relations in fact took place. It does not follow that the fact of marital relations is conclusive to condone or forgive prior cruelties and indignities, particularly where compliance with a husband's demands may be motivated by practical necessity, or fear of violence and further indignities such as had marked their previous separation. In the instant case we think there was sufficient evidence to

overcome any inference of condonation, and that the chancellor was, therefore, warranted in concluding that there had been no condonation. We may note that his conduct after she left was not such as to manifest a real desire that she return. Cf. *Hite v. Hite,* 210 Md. 576, 583.

The appellant contends that since the wife had sufficient means, by virtue of her employment and some investments to provide for her needs, the chancellor abused his discretion in allowing her any alimony. We do not agree. The chancellor found that the husband had a net worth of at least $475,000, a net business income of over $28,000 in 1958, plus a large income from stocks and bonds. Her gross income was not in excess of $11,000, and her net worth about $20,000. The parties had lived well in a large home in a fashionable neighborhood, and had travelled extensively. Notwithstanding Code (1957), Art. 16, sec. 5, we have clearly pointed out that there are other factors to be taken into account. See *Donigan v. Donigan,* 208 Md. 511, 518, and cases cited. Nor do we find the fee allowed excessive under the circumstances. Cf. *Danziger v. Danziger,* 208 Md. 469, 475. We were told at the argument that counsel for the wife will not claim any additional fees, except for his services on this appeal.

*Decrees affirmed, with costs.*